Case number 14-7168, Kingman Park Civic Association Appellant v. Muriel Bowser in her official capacity as Mayor of the District of Columbia. Mr. Walton for the appellant, Mr. Lederstein for the appellate. Good morning, your honors. Fraser Walton on behalf of the Kingman Park Civic Association. At this time, your honors, I would like to indicate to the court that we are alleging three errors that were made by the trial court of the District of Columbia. And among those errors is the decision that the District of Columbia properly passed the Transportation Infrastructure Amendment Act of 2010, allowing for the construction of streetcar lines along H Street and Biddings Road Northeast. We maintain that the District erred when they introduced and passed that legislation because specifically cutting to the chase, portions of H Street and the Kingman Park area are part of the LaFont City Plan. And that jurisdiction is reserved to the National Capital Planning Commission and not the District of Columbia. What the District of Columbia did was to circumvent the authority of the National Capital Planning Commission by introducing and passing the local legislation in an effort to secure what they believed was the correct method of constructing the streetcar line along H Street. Specifically, again, as the court is certain aware, there was an 1888-1889 appropriation statute which also prohibited the District from constructing overhead lines, Canterbury lines, in the District of Columbia for the purpose of operating the streetcar line. There was also the Barnes decision, Barnes versus the District of Columbia, which was rendered by the Supreme Court of the United States, giving authority to a Board of Public Works. The Board of Public Works, we maintain, was the forerunner to the National Capital Planning Commission, which was charged with the operation and control of the streets of the District of Columbia. Now, of course, the Home Rule Charter was passed. And in passing the Home Rule Charter, it gave the District authority to regulate itself, particularly on local manners. The District maintains that the streetcar is a local manner. We maintain that it is also a local manner. However, it receives federal funding. It receives federal certification that the District maintains. It does not receive federal funding, but in fact it does. It was proposed as a 37-mile project, of which 2.2 miles were along the H Street Biddings Road project. In addition, again, it overlapped with the authority of the National Capital Planning Commission, which certainly prevented it from circumventing and going around the jurisdiction of that authority. But once the Home Rule Act was passed and they had the legislative authority to handle something that was purely local, why would the fact that there is federal funding change their authority? Well, for two reasons, Your Honor, and that brings in the second issue. With respects to the federal funding, that brought in issues. And I think the trial court noted it. The trial court maintained that there was no federal funding, which in fact there was. It brought in the issue of the National Environmental Policy Act, which triggered the jurisdiction of the federal government at that point. It was also licensed, and I think that's been pointed out. I don't think counsel would object to that, opposing counsel. It's certified by the federal government for safety purposes. So therefore, there was jurisdiction that brought in the Federal Highway Administration and various other federal agencies which had oversight authority. I'm not hearing your answer to Judge Brown's question. Yes, Your Honor. Again, how is funding? I believe the question was how is funding? No, the question was why did the Wire Act have any effect given the district's home rule? I think the Wire Act had effect because, again, the city was intruding upon the jurisdiction of the National Capital Planning Commission, which controlled the construction of any areas along 8th Street from 1st to 15th because it is a part of the LaFont plan. The LaFont plan was, as you know, Your Honor, Judge Williams, the LaFont plan was a part of the original city plan, the city of Washington, as well as parts of Kingman Park, which went through East Capitol Street to 19th Street. All of that is still a part of the original LaFont plan, which is within the jurisdiction of the National Capital Planning Commission. When the legislation was introduced by Councilman Wells, the Transportation Amendment Act, and it was an amendment act to the original legislation, that was done in an effort to legitimize, we maintain, and to authorize the construction of the streetcar line. That was the reason that was done. But it was done, we maintain, illegally because it overlapped with the authority of the National Capital Planning Commission. Okay. Perhaps I'm not understanding your argument, so maybe you can help me out. Because I thought I heard you say that you agree with the district that this is local legislation. Yes, Your Honor. All right. So what I'm trying to understand is, once we have the Home Rule Act, and once we have local legislation, there doesn't seem to be anything that stands in the way of the district enacting something like the TIEAA. I think I understand you perfectly now, Judge Brown. Thank you. Thank you, Judge Williams. That's cleared up for me. When I said I agree, I do agree that it is a local matter. But it is a local matter when it is outside of the jurisdiction of the National Capital Planning Commission. As long as they're within, they're introducing legislation that is controlled by the National Capital Planning Commission, i.e., the National Mall, which is the Monumental Core area, then they need the authority of the National Capital Planning Commission to do this. And the National Capital Planning Commission's authority covered H Street. So while they could do it in Anacostia, they could do it in Ekington or above, outside of the actual LaFont City plan. So it's a local matter to the extent that it is not within the LaFont plan. That's what I meant by a local matter. With respects to the environmental impact statement, Your Honor, I believe, again, the court erred in holding that Kingman Park failed to show that the district was not required to prepare an environmental impact statement. And we maintain that it was required to prepare an environmental impact statement because of the nature of the construction. There was a number of triggers, including traffic, which the district maintains that traffic is not covered by the environmental impact statement. Let's assume, in your favor, that every environmental issue you raise is something that, if there's sufficient showing, has to be examined in an environmental impact statement. Assume that. Yes, sir. And assume you have standing with respect to all those issues. Could you point me to particular issues where you think the EISF was inadequate because of specific allegations that you have made that shows that there are environmental concerns that need further exploration? Yes, Your Honor. I believe, number one, there was the allegation that there was an underground stream, an old stream. I mean, I may have missed it, but did you offer proof that that underground stream still existed? Well, Your Honor, we... Yes or no? No, Your Honor. And if I could... Why doesn't that take care of the issue? Yes, sir. Because, Your Honor, we were not permitted the discovery that we needed to do that. In the geological survey, as the court, I'm sure, is aware, indicates, and that's by the district's own report, that there is an underground stream that exists there. And we know that from living in the community. Yes, but the district court stated facts that seem to be in the record showing that this stream appeared to have been removed effectively, I guess it's with the construction of the school back in 1931. Thank you. Anyway, a long time ago. Yes. Or you show that thereafter it sprang to life. That seems to take care of that issue. Well, Your Honor, the reason that Spingarn, the area where they're constructing the streetcar, was left as an open green space along Bennings Road was because of the underground stream, which still exists there, that runs from the National Arboretum and comes down right under Spingarn. So they could not construct on that portion of the land. We have been lifelong residents of that area. We know this. And that's why the geological survey indicated and showed that there was an underground stream. Now, the irony of it is, Your Honor, is that the district says, as Your Honor has well pointed out, that there is no underground stream. But it is well known, Your Honor, that they've had tremendous problems the last two years in the construction because of that underground stream. That's where the problem has existed. That's not on the record, is it? No, it's not, Your Honor. It is not. We're reviewing a district court judgment. Yes, Your Honor. Based on the record, and that's all we have. That's correct. And in addition, Your Honor, we represent that there are chemicals in the ground that the district says it was at safe levels, there was no problem, just a few feet away at RFK's parking lot, which is literally across the street. There were elevated levels of lead, cyanide, chromium, mercury, many chemicals in the ground. And we maintain that there should have been. Now, the EISF talks about a variety of chemicals. Yes, sir. Right? But you say that that discussion is inadequate? Yes, I do. Yes, we do. And it's inadequate because of what specific thing that is in the record? Your Honor, we feel that it is inadequate because on the one hand, just a few feet away, when the owners of the Washington football team proposed building a new stadium, it was found that there were serious problems with the ground just a few feet away. So we're maintaining that if we had been given the opportunity for full discovery, which we requested, we could have made those determinations. We were not even permitted on the lot to take land samples. So therefore, but we know from the history of the neighborhood. Now, there are, of course, the record shows the taking of core samples of various kinds. Yes, sir. By the district. And those you say are inadequate? We absolutely believe that, Your Honor. We try it. I mean, without discovery, you'd still have an expert describing in what respect the core samples were inadequate, I would think. Well, Your Honor, we would maintain that we had an expert as well, Mr. Herman, who said that they were using industrial standards as opposed to a residential standard. That's a residentially zoned area. The Lyston Terrace apartments are literally 10 feet exactly, 10 feet from that location. And that's near homes. That's people live there. And they're low income people. And we believe that based upon our experts report that the use of an industrial standard for safety as opposed to a residential standard for safety was clearly a violation. And that's what the district admits that it used. An industrial standard to decide safe levels. And then we can move on, Your Honor. We can move on. I'm sorry. I didn't see in your brief anything that called my attention to something in the record showing that the actual numbers in the EISF documents showed an excess of what was suitable for residential areas. Well, Your Honor, I'm not saying that it showed an excess. I'm saying that they used an industrial standard to determine safety as opposed to, I'm sorry, as opposed to a residential standard. They were using an industrial standard. And this is a residentially zoned area. Well, Your Honor, I guess I'm not sure what difference that makes if the actual numbers are consistent with, say, residential life. Well, Your Honor, I think it makes a big difference because in an industrial setting, I think, and I don't have the statistics in front of me, but I think an industrial standard allows for a higher level because people are now. I understand how there might well be different levels. Yes, sir. Your Honor, I'm still not sure why the actual numbers as to concentrations and so forth that were developed are inconsistent with residential use. Well, Your Honor, I don't believe that we have those sufficient numbers. And that's been a part of the big problem here in fighting this case because I think that by not allowing us, by not putting this on a discovery scheduling plan and by not allowing us to move forward with interrogatories, depositions of witnesses, I think that disabled us. It greatly disabled us. But I think there is enough in the record and there's been enough issues relating to safety, relating to flood plans. I mean, I'm looking at these soil laboratory results on pit 201 and I missed it, but did your brief call our attention to anything indicating that these numbers were either wrong or excessive by residential standards? No, Your Honor, I don't believe we have because we felt that they were using and no, we did not. Let's forget about their standards. Yes, sir. And consider the numbers. Right. We have some reason to think the numbers either are wrong or are right but inconsistent with residential use. Well, Your Honor, no, we have nothing to contradict those particular statistics. We do not. And I will state that for the record, of course, but we maintain that if you look at that in comparison with just a few feet away, RFK stadiums where there were elevated levels, then I question the validity, respectfully, of the district statistics. We have no way of challenging what they did because we did not have the opportunity to conduct our own discovery, to get core samples, to have those analyzed, and we believe that's a fundamental flaw in the situation and the decision that was taken by the trial court. We felt we were disabling. With respects to our third issue, Your Honor, which was the allegation that we were not given protection under the Equal Protection Clause by the court and the court erred in that decision, we listed a number of reasons why we believe that Kingman Park was adversely affected. One, Your Honor, we believe that a statute was enacted in Kingman Park. The district maintains that it was a 37-mile project that was slated for the entire city. But, Your Honors, the statute, 9, I believe, 1171, indicates it's for the limited purpose, limited, of construction along 8th Street and Bennings Road. And when you look at the fact that we were not given proper notice to our ANC, the Great Wait Authority, was not recognized. We had no council member at the time, Ward 5, that was at the time when Mr. Harry Thomas had resigned. We had no council member to represent us. All of these actions were taken by the district. In addition, the district did not give us that opportunity. They circumvented many of the rules that normally would be applied, and we listed those rules. The violations of traffic studies, they maintain, again, and I think that's one of the most serious violations, is that traffic studies are not a part of an environmental impact statement. And we maintain that traffic is integral to an environmental impact statement for one main reason. Because if you look up, the Webster's Dictionary defines the environment, and so does the district's DCEPA Act as affecting land, air, water. Those are the direct impacts. And then when you look up the physical environment, which the D.C. Environmental Policy Act states, the physical environment, you look up the word physical, it certainly means the natural as well as material effects on the environment. And traffic is a material effect. And so we believe that that's been a cause of a lot of the problems with the streetcar lines, because there was not participation by the community, there was no participation by various other agencies, by various other organizations. Had there been, we believe a lot of the problems that are now existing with the current streetcar line would not exist. But it was done because we maintain the district felt that they could take advantage of the community. They could come in without giving an environmental impact statement. This was a project over $1 million, it's millions and millions of dollars, we believe, and it had a major impact not only on Kingman Park, but it will have a major impact on the entire city, and that it should be required henceforth for the entire city, because to construct something of this nature without including neighborhoods from Georgetown to Southwest would be a travesty to allow the district to merely hire a consultant who would tell the public everything is fine, we can go forth and do this construction without involving the community. So for that reason, we believe that at a bare minimum, an environmental impact study would be required whenever a project of this nature and this amount of money is being expended, taxpayer dollars, without the input of the community. Thank you, Mr. Rogers. Good morning. May it please the court, I'm Jason Letterstein for the District of Columbia in this case. And we would ask that you affirm the dismissal of the complaint below. That dismissal occurred with respect to many of the allegations in the complaint on a 12B6 motion and standards. However, I want to address the environmental impact issues that were talked about in the argument. In that situation, the court did rule that the district head was entitled to summary judgment on whether it needed to prepare an environmental impact statement under the D.C. Environmental Policy Act. In that situation, it was undisputed by all the parties that the standard for the court to apply in that situation was not whether there was actually a negative impact on the environment per se that might arise from any of the project that the district was constructing, but rather whether the agency, DCRA in this situation, acted in an arbitrary, capricious, or otherwise unreasonable manner in determining that an environmental impact statement was not required. It's a very deferential standard. So that queued up on the summary judgment situation, basically the idea that the Cayman Park Civic Association, KPCA, would have to demonstrate that there was a genuine issue of material fact as to whether that deferential standard had been violated by DCRA. And in that regard... What harms are cognizable? What is your basic argument as to the way in which the D.C. Act is narrower than NEPA? Well, it clearly tracks NEPA. But I think we discussed the idea of traffic not being a part of the D.C. local statute because... Why not? Well, in contradistinction to the NEPA, which talks about potential impacts on the human environment, the District of Columbia chose to just adopt the definition or the wording of environment. Why does that make it broader? I mean, normally if you have a class of things and then you draw a line excluding certain things from that class, non-human, that makes it narrower than the broad circle environment. That could be one way of... Any omission of human makes the scope of the D.C. Act larger. Well, if that's all it said, if all it said was the environment, that would be a very reasonable position. But it went further to define environment. And when it did so, it specifically limited it to land, air. I don't have all the specifics, but it was just physical conditions of the environment. Aren't things that happen on land part of it? I mean, you weren't claiming that noise, for example, is excluded, right? We've not made that argument. It wasn't raised here. I mean, that's a matter of sound waves traveling through the air. They're clearly in. Why aren't large vehicles traveling through the air in? Well, I think air is what you indicated would make that within the definition of environment as a district. Sound waves technically aren't air. No, but they interfere with the air. So vehicles interfere more substantially, I would say. In a metaphysical way, I think you're right. But what we would make a point, though, here, is that the district addressed in the alternative if traffic were, in fact, a part of the DCEPA. And in this instance, what KPCA just never responds to in any of its pleadings is the fact that the district put a traffic study within an attachment to the environmental impact screening form. And that traffic study looked at any potential impact from the car barn being built at the Spingarn site, specifically looked at whether the need for the streetcar to cross the westbound traffic lane before going into the car barn site would cause any type of traffic delays, and therefore all the consequences that might flow from a traffic delay. And it said there was no impact. There was no impact that it would see. And as a result, I mean, why would it be unreasonable for the DCRA at that point, getting a traffic study from traffic experts, indicating that it would not cause inordinate delays with the traffic signals and such, to rely on that to say, well, it doesn't look like traffic is going to be negatively impacted. That was never addressed by KPCA below. And yet, in fact, it's dispositive in our view as to this deferential standard review. With respect to ‑‑ I'm sorry, my eyes are not what they used to be. There was a statement about the O stream being the reason that the Spingarn site was left open in terms of its campus for green space. I just want to note that we didn't see anything in the record that was promoted by KPCA below to indicate that that was the reason the O stream was left as it was at the time that the Spingarn site may have been initially planned or built. There's just nothing in the record to that effect. The only thing in the record is what the district had put in with the screening forms that indicated that the O stream probably doesn't exist anymore, likely doesn't exist anymore. And that's what the trial court looked at. So, in the end, I mean, of course, we're available for any questions on the environmental impact issue, but under the deferential standard of review, there were just simply no genuine issues of fact that were raised by KPCA, particularly because what is not addressed is the fact that the district had put in an affidavit from an employee at the ‑‑ I think it was called DDOE at the time, now it's the Department of Environment and Energy, I think, in which that person looked at the site sample results that your Honor was discussing and said that they were consistent with very typical concentrations for non‑human type promoted chemicals within the soil, well below as a matter of fact. And then as far as the EPA standards go, that they were certainly within safe limits there with respect to other metals. And so there was an affidavit stating that these sample results from TRIAD were quite safe. And as a result, why would DCRA be unreasonable in relying on the TRIAD site samples? Instead, KPCA suggested below that they should be looking at site samples that were taken off the site at RFK or in the Anacostia River that were not explained as being harmful in any event, but even if they were, KPCA never explained why DCRA, as part of its reasonable review of environmental impacts, would need to look at something that is off the site and 20 or more than 20 years old. Is DCRA charged under D.C. law with responsibility for administering the D.C. EPA? It is, by regulation I believe, it is considered to be the lead agency in terms of determining, well, the review agency, I'm sorry, in terms of reviewing whether there's a need for any environmental impact savings. So under D.C., under your understanding of D.C. law, it gets the benefit of the deferential standard because it's the administering agency? Yes. If one seeks to review the administrative agency action, the District of Columbia has adopted the APA standards, even when it's not a situation of a contested case situation under the district's APA, and so very much like the NEPA and how it's treated in terms of the standard of review of agency action, it gets that deferential standard. Thank you. With respect to, so we've been discussing the car barn and the environmental impact. There was also the claims raised about the wires that were constructed as part of that, and what we would simply say there is, as the court knows, the district court below found that there was no standing by KPCA or any of its members to have challenged the erection of wires, both on A Street and Benning Road and out. I understand that. Why is the visual impact obviously an injury to the climate as an organization that's interested in maintaining the quality of the park? Well, I think the organizational standing would depend on more than just sort of a setback to its interest. It would have to show some sort of real concrete harm to its resources and its expenditure. And what's the difference between that and the barn then? Because you're acquiescing to the notion that the organization had this requisite impact with respect to the barn. Well, because they had filed an application for landmark status with respect to the Spinning Garden site itself, the school building, and that's an expenditure of money and an expenditure of resources in order to protect that site from whatever protections are afforded under the Historic Preservation Review Act. And before this case, I think, was briefed, they also had filed an application, I believe, for the entire grounds to be protected. So that's an outlay of money, expenditures, and resources pursuant to its abstract interests that could conceivably be something that would give it organizational standing. But it's just not the same with the wires. But if they're protecting, if they want historic preservation of this site, don't the aesthetics count? I mean, doesn't bringing all these wires onto the site affect? It could. We're not suggesting that there isn't an argument that could be made at some point with more facts that would indicate organizational standing with respect to the wires. But with what was presented, there just wasn't sufficient concrete injury to the organization itself. And as to the members. To me, when you're talking about visual impact and you're talking about a place that does not have overhead wires and that is about to have overhead wires, it's pretty clear. What more do you want? Well, I think. You want a photograph of the as yet unbuilt wires? Well, Your Honor mentions a photograph, but as we pointed out in our brief, there actually is a photograph in the record that indicates there are plenty of wires, telephone wires that are already erected on the Spingard campus. So this is not a situation where there are no wires and then wires are suddenly. Right, but more wires is worse. I mean, that's the argument, obviously. It certainly could be. We're not suggesting that there isn't an argument that could be made about visual impacts. Visual impacts are important to the city, of course. Absolutely. We just believe that the district court had an adequate basis to find there was no case of controversy over the wires because the actual harm just wasn't concrete enough both to the organization and to its individual members based on the idea of electromagnetic radiation. But we briefed, in this case, the merits of the wires argument by TPC. If we could agree with you on the standing point, what is the answer so far as the environmental impact statement is concerned? I'm sorry, with respect to the wires? Yeah. I guess the usual requirement of assessing alternatives is there an assessment of underground I'm not sure if it's streetcars, that's even a possibility. Well, the legislation that authorized the wires, we had referred to the legislative history that went into that legislation, and it was clear that DDOT was looking at alternative possibilities for wires, or for propulsion methods, I'm sorry, such as electronic or just electric propulsion. And at the time that that act was passed by the council, DDOT was indicating that it just wasn't advanced enough and it hadn't been tested in the particular environment of the District of Columbia. So to them, it seemed that if we want to get the streetcar up and running, as had been planned for at least 10 years prior to the enactment by the council, at this point the best propulsion technology would be overhead wires. And that's what led to some of the distinctions between various geographical areas of the city and different lines that might be constructed because there would be more time for the extra lines to consider advanced propulsion technologies. But with respect to the, I think your question, was it as to standing or environmental impacts of the wires? No, I'm assuming standing, and I guess the, I think you've been answering my question really as to consideration of alternatives, although I guess the one thing you haven't mentioned explicitly is weighing the tradeoff between the environmental, the visual downside, and all these other arguments. That may be implicit. It is implicit, but respectfully I think what we would say on that issue is it really is a political determination. It's one that the council... Yeah, I'm not sure that that gets you out from under environmental impact. No, of course there has to be a scientific review of whether there will be impact on the environment from the wires. But again, it's at the stage of determining whether there is likely to be a negative impact. Again, the standard was for DCRA to be reasonable, not arbitrary and capricious in looking at this. And there just isn't enough evidence in the record that would show that DCRA was unreasonable with respect to the issue of electromagnetic radiation. I mean, as far as the visual issues, we would not indicate that that would be a part of an environmental impact study. That might be an issue with respect to standing, and it may be an issue with respect to whether this was the right way to go. But as for determining whether an environmental impact study was necessary, we're focusing on the environment. Excuse me. How do you get the wires out of the environment of your reading of the DC Act? Well, I think the DC Act was clearly looking at protecting the safety and health of the District of Columbia and its citizens. And so one… No, the Act has nothing aimed at protection of aesthetics. I don't believe that the DCEPA was enacted for purposes of aesthetics. I think it was enacted for purposes of protecting the environment and the people as a result. What is there in the language that excludes aesthetic values? Well, the definition of environment, as we indicated, is limited to the physical aspects of what we call our space. Your Honor, certainly I understand that one might view visual impacts as affecting the air to the extent it would be necessary to consider. I just think it would be difficult to determine what the impact, whether the negative impact from visual type of obstruction. That would be a very difficult standard for an agency to implement. I mean, as opposed to hard data. Well, it may be that the agency in the end is bound to completely throw up its hands. I accept that. But the normal requirement for these things is that somebody look and compare, and then whatever decision they make is beyond the review of the courts. As long as they look and compare. Right. I just, I don't, my memory doesn't tell me the particular sections of these enormous documents that were submitted in the EISF where I can point to you in the record where visual impacts might have been looked at. I do think there was geoarchaeological studies that were also provided, which talked about some of the historic aspects of the site. And I do believe they referenced ideas of whether it might in some way affect the historic aspects of Spingarn. So I think maybe as my memory comes back a bit on this point, there is in the record indications that DCRA would have looked at that issue. I just don't think we have, within the DCRA documents, a specific statement about aerial wires and their aesthetic impact. But what we do think KPCA is arguing here is, with respect to the environmental impact statement, is the electromagnetic radiation issue. And we address that. Although, you know, the district court felt that KPCA had not actually put that in their complaint, we do think that what they say has some currency in that they incorporated aspects of electromagnetic radiation in many aspects of their allegations. So it ought to have been perhaps something that the court might have opined on. But it did. It did opine on it in a different, slightly different context in indicating that it was just simply too speculative to think that there was that type of electromagnetic injury coming from wires that would have, therefore, required some sort of further evaluation by DCRA. As for if we assume standing for a minute with respect to those wires, as I said, we briefed the issue on the merits of whether it was in any violation of the Home Rule Act or it was in any way discriminatory. I would simply note that KPCA has not really come forward with any convincing type of argument that the National Capital Planning Commission has control over the streets of the District of Columbia. The case that they cited just simply didn't talk about that. It was very limited to this Board of Public Works back at a previous time of the district's attempt at Home Rule. Clearly, what the Home Rule Act allows is for the council to enact laws that amend acts of Congress or repeal them that are strictly local in nature, and that's what this Appropriations Act was. So as a result, there was no barrier to the council enacting the wires laws. And as a result, and with respect to any type of discriminatory claim, of course, the wires act is neutral on its face. It was simply enacting it for the purposes of getting the first leg of the streetcar line up. There was nothing to suggest that it was trying to discriminate against any particular area of the city. It had to carve out an exception for the downtown areas because that is strictly federal government territory and the district would not be permitted to legislate with respect to that area. So it simply allowed for the streetcar to get up and running on its first line. And as for the, I think the last remaining argument that was dealt with was the car barn itself and whether that had been discriminatory. KPCA has talked about some of the history of the decision making. But we submit on our brief and what we indicated that while there may have been what some people would perceive as a rush to put the streetcar up, perhaps there could have been more consideration of other views. Although we don't believe that that's accurate because the DDOT did go out into the community before it erected or decided to choose the car barn site. Regardless, that's just not an indication of discriminatory intent by the Department of Transportation to locate the car barn on the Spingarn site. The affidavit that the district put into evidence for a summary judgment ruling on this issue was by Mr. Nicholson who was part of DDOT and he explained the scenario that went into this, the decision making, and it was all based on programmatic and policy concerns. And as a result, while there may be some insensitivity that's viewed as to how DDOT operated, it certainly wasn't discriminatory. And so that case was properly dismissed on summary judgment grounds. So we ask that you affirm the court below. I answer any questions. Thank you very much. Thank you. Mr. Walton, you had used up all of your time, but the court will give you a minute for rebuttal. Thank you, Your Honor. Thank you, Your Honor. I will abide by that minute. Your Honor, we would ask that this case be at a minimum reversed and remanded to the district court for further discovery. We will represent to you that the D.C. Environmental Policy Act incorporates the comprehensive plan. If you look at the act, it clearly states that it incorporates the comprehensive plan, which augurs for the avoidance of electromagnetic radiation within the community. We are very concerned about that because this is a new science. This is something that was recently discovered in the last 30 years, that electromagnetic radiation from overhead wires are a danger, particularly to young children and pregnant females. So we would ask the court at a minimum, when you're doing all this construction, all of these overhead wires and electrical generation stations on this site, that we be given the opportunity to find out the exact dangers that it has for the community. Thank you, Your Honor. Thank you, Mr. Walton. The case will be taken under submission.
judges: Brown, Srinivasan, Williams